IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC HENKEL, | : |
| | : |
| And | : CIVIL ACTION NO.  02-CV-4060 |
| | : |
| TYLER KOENIG., | : |
| on behalf of themselves and all others | : |
| similarly situated, | : |
| | : |
| Plaintiffs, | : |
| v. | : |
| | : |
| NATIONAL COLLEGIATE ATHLETIC | : |
| ASSOCIATION, | : |
| | : |
| Defendant. | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |

---

## NCAA'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

---

The NCAA, by and through its counsel, hereby moves the Court for an order dismissing

with prejudice the claims of plaintiffs pursuant to Fed. R. Civ. P. 12(b). Furthermore, the NCAA

moves for summary judgment in its favor pursuant to Fed. R. Civ. P. 56.  This motion is

supported by the NCAA's Memorandum in Support of NCAA's Motion to Dismiss and for

Summary Judgment.  It is further supported by the Declaration of Jan Gentry, the Declaration of

Angie Grant and the Declaration of Frederick R. Juckniess with exhibits attached thereto.

WHEREFORE, the NCAA prays for the following relief:

    (1)   an Order dismissing plaintiffs claims with prejudice; or, in the alternative

    (2)   an Order granting the NCAA judgment in its favor; and

    (3)   such further relief as the Court deems just and equitable.


DATED:  August 26, 2002


                    Respectfully submitted,

                    DRINKER BIDDLE & REATH LLP

                    By:
                    David P. Bruton
                    Paul H. Saint-Antoine
                    One Logan Square
                    18th and Cherry Streets
                    Philadelphia, PA  19103-6996
                    (215) 988-2700

                    and

                    Gregory L. Curtner
                    Frederick R. Juckniess
                    MILLER, CANFIELD, PADDOCK AND STONE,
                    P.L.C.
                    101 North Main
                    Seventh Floor
                    Ann Arbor, MI  48104-1400
                    (734) 663-2445

                    Attorneys for Defendant National Collegiate
                    Athletic Association

AALIB:375295.1\063863-00024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC HENKEL, | : | |
| | : | |
| And | : | CIVIL ACTION NO. 02-CV-4060 |
| | : | |
| TYLER KOENIG., | : | |
| on behalf of themselves and all others | : | |
| similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| NATIONAL COLLEGIATE ATHLETIC | : | |
| ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## NCAA'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## AND FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

FACTUAL BACKGROUND ........................................................................................1

    A.    The National Collegiate Athletic Association And Its Recruiting
            Rules.....................................................................................................1

    B.    Camps, Events and Recruiting Services ........................................................4

    C.    Plaintiffs' Complaint .....................................................................................6

    D.    NCAA's NONCOMMERCIAL Certification Requirements For
            Summer Camps and Events ...........................................................................8

DISCUSSION ..............................................................................................................14

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION SINCE
    THERE IS NO CASE OR CONTROVERSY. .......................................................15

    A.    The Court Lacks Subject Matter Jurisdiction Because Plaintiffs'
            Claims Are Moot...........................................................................................16

    B.    Plaintiffs Do Not Allege an Injury-In-Fact..................................................17

    C.    Plaintiffs Do Not Allege Facts Demonstrating Causation ...........................18

II.    PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR FAILURE TO
    STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED....................18

    A.    Plaintiffs' Claims Must Be Dismissed Since the Challenged Bylaw
            is Noncommercial and Not Subject to the Sherman Act. ............................20

    B.    Plaintiffs Have Failed to Plead Facts Which Could Support Standing
            to Challenge Recruiting Rules Under the Sherman Act. .............................25

            1.    Plaintiffs Fail to Plead Any Injury-In-Fact. ......................................27

## TABLE OF CONTENTS
### (continued)

2.     Plaintiffs Fail to Plead an Injury to "Business or Property"............29

3.     Plaintiffs Do Not Allege Any "Antitrust Injury."............................33

C.     Plaintiffs' Failure to Plead the Essential Elements of a Claim Under Sherman Act §1 Warrants Dismissal and Precludes Injunctive Relief.......34

1.     Plaintiffs Do Not Identify a Conspiracy ..........................................35

2.     Plaintiffs Fail to Plead Facts Showing That the Recruiting Bylaws, or 30.16(l), Have A Substantial Anticompetitive Effect in Any Relevant Market.........................................................35

3.     The Certification Bylaws Are Procompetitive and Reasonable as a Matter of Law ...........................................................................37

III.     THE NCAA IS ENTITLED TO SUMMARY JUDGMENT ...............................42

A.     There is No Genuine Issue of Material Fact Remaining Regarding Whether Plaintiffs Will Be Subject to 30.16(l)...........................................43

B.     Plaintiffs Cannot Demonstrate a Genuine Issue Regarding Their Opportunity to be Observed by Division I Coaches. ...................................43

C.     Plaintiffs Cannot Demonstrate an Issue of Fact Regarding any Antitcompetitive Effect on Any Relevant Market Due to 30.16(l). ...........45

D.     The NCAA is Entitled to Summary Judgment Because The Recruiting Bylaws are Procompetitive Under the Rule of Reason.............46

CONCLUSION ...................................................................................................47

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

A-Abart Electric Supply Inc. v. Emerson Elec. Co.,
    956 F.2d 1399 (7th Cir. 1992) ...................................................................................45

Adidas America, Inc. v. NCAA,
    64 F. Supp. 2d 1097 (D.Kan. 1999)............................................................................36

Apex Hosiery v. Leader,
    310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940)............................................................23

Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters,
    459 U.S. 519 (1983)...................................................................................25, 26

Atlantic Richfield Co. v. USA Petroleum Co.,
    495 U.S. 328 (1990)...................................................................................26

In re Baby Foods Antitrust Litig.,
    166 F.3d 112 (3rd Cir. 1999) ...................................................................................34

Banks v. NCAA,
    977 F.2d 1081 (7th Cir. 1992) .........................................................16, 17, 19, 25, 36, 40

Bathke v. Casey's General Stores, Inc.,
    64 F.3d 340 (8th Cir. 1995) ...................................................................................45

Bell v. Dow Chemical Co.,
    847 F.2d 1179 (5th Cir. 1988) ...................................................................................45

Blue Shield of Virginia, Inc. v. McCready,
    457 U.S. 465 (1982)...................................................................................25

Bowers v. NCAA,
    9 F. Supp. 2d 460 (D. N.J. 1998) ...................................................................20, 42

Brown Shoe Co. v. United States,
    370 U.S. 294 (1962)...................................................................................37

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997)...................................................................................18

California Dental Ass'n v. FTC,
    526 U.S. 756 (1999)...................................................................................39

**CASES**                                                                    Page(s)

Cargill, Inc. v. Monfort of Colorado, Inc.,
    479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).........................................................31

In re Circuit Breaker Litigation,
    984 F. Supp. 1267 (C.D. Cal. 1997) ...................................................................................35

Coast Cities Truck Sales v. Navistar Int'l Transp. Co.,
    912 F. Supp. 747 (D. N.J. 1995)........................................................................................36

College Athletic Placement Svc., Inc. v. NCAA,
    1974 WL 998 (D. N.J. 1974), aff'd, 506 F.2d 1050 (3d Cir. 1974) ...................................20

Colorado Seminary v. NCAA,
    417 F. Supp. 885 (D. Col. 1976)........................................................................................30

Consol. Metal Prods., Inc. v. American Petroleum Inst.,
    846 F.2d 284 (5th Cir. 1988) .............................................................................................35

Dedication & Everlasting Love to Animals v. Humane Soc'y of the U.S.,
    50 F.3d 710 (9th Cir. 1995) ...............................................................................................21

Doctor's Hospital of Jefferson v. Southeast Medical Alliance, Inc.,
    123 F.3d 301 (5th Cir. 1997) .............................................................................................45

First Nat'l Bank of Az. v. Cities Svc. Co.,
    391 U.S. 253, 88 S. Ct. 1575 (1968)..................................................................................42

Gaines v. NCAA,
    746 F. Supp. 738 (M.D. Tenn. 1990)...........................................................................20, 42

Graham v. NCAA,
    804 F.2d 953 (6th Cir. 1986) .............................................................................................30

Greater Rockford Energy & Tech. v. Shell Oil,
    998 F.2d 391 (7th Cir. 1993), cert. denied,
    510 U.S. 1111, 114 S. Ct. 1054 (1994)..............................................................................35

Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,
    128 F.3d 59 (2d Cir. 1997)................................................................................................19

Hamilton v. Tennessee Sec. Sch. Athl. Assoc.,
    552 F.2d 681 (6th Cir. 1976) .............................................................................................30

Hawkins v. NCAA,
    652 F. Supp. 602 (C.D. Ill 1987) ..................................................................................22, 30

**CASES** **Page(s)**

Herbert v. Wentatuolo,
        638 F.2d 5 (1st Cir. 1981).......................................................................................30

Jones v. NCAA,
        392 F. Supp. 295 (D. Mass. 1975) ...............................................................21, 42

Jones v. Wichita State Univ.,
        698 F.2d 1082 (10th Cir. 1983) ....................................................................30

Justice v. NCAA,
        577 F.Supp. 356 (D. Ariz 1983) ..........................................................31, 39, 40

Kingray, Inc. v. NBA, Inc.,
        188 F.Supp.2d 1177 (S.D.Cal. 2002)..............................................................18, 34

Klor's Inc. v. Broadway-Hale Stores, Inc.,
        359 U.S. 207 (1959)...............................................................................................19

Knapp v. Northwestern Univ.,
        1996 WL 495559 (N.D. Ill. Aug, 28 1996),
        101 F.3d 473 (7th Cir. 1996), cert. denied, 117 S.Ct. 2454 (1997) .....................30

Law v. NCAA,
        134 F.3d 1010 (10th Cir. 1998) ..................................................................22, 39

Los Angeles v. Lyons,
        461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).......................................15

Lujan v. Defenders of Wildlife,
        504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).....................................26

M&H Tire Co. v. Hoosier Racing Tire Co.,
        733 F.2d 985 (1st Cir. 1984).....................................................................21, 23

Marjory Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. and Secondary Sch., Inc.,
        432 F.2d 650 (D.C. Cir. 1970) ...................................................................21, 23

Markowitz v. Northeast Land Co.,
        906 F.2d 100 (3d Cir. 1990)..............................................................................18

Martin B. Glauser Dodge Co. v. Chrysler Corp.,
        570 F.2d 72 (3d Cir. 1977), cert. denied, 436 U.S. 913 (1978) .........................38

## CASES                                                              Page(s)

Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,
    475 U.S. 574, 106 S. Ct. 1348 (1986)............................................................42

Missouri v. Nat'l Org. of Women,
    620 F.2d 1301 (8th Cir. 1980) ....................................................................21

NCAA v. Board of Regents,
    468 U.S. 85, 104 S. Ct. 2948 (1983)............................................................34

NCAA v. Board of Regents of Univ. of Oklahoma,
    468 U.S. 88, 104 S.Ct. 2948 (1984).............................................21, 22, 34, 39, 40, 41, 42

NCAA v.Tarkanian,
    488 U.S. 179 (1988)....................................................................................42

Nat'l Org. of Women, Inc. v. Scheidler,
    968 F.2d 612 (7th Cir. 1992), 510 U.S. 249 (1994).........................................21

Northeast Women's Center, Inc. v. McMonagle,
    670 F. Supp. 1300 (E. D. Pa. 1987) ............................................................37

Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.,
    472 U.S. 284 (1985)....................................................................................34

O'Dell v. General Motors Corp.,
    122 F. Supp. 2d 721 (E.D. Tex. 2000)..........................................................45

O'Shea v. Littleton,
    414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)........................................15

Pace Elecs., Inc. v. Canon Computer Sys.,
    213 F.3d 118 (3d Cir. 2000)........................................................................27

Parish v. NCAA,
    506 F.2d 1028 (5th Cir. 1975) ....................................................................30

Pocono Invitational et al. v. NCAA,
    Case No. 00-CV-5708..................................................................................28

Poindexter v. American Bd. of Surgery, Inc.,
    911 F. Supp. 1510 (N.D. Ga. 1994)..............................................................35

Precision Surgical, Inc. v. Tyco Int'l, Ltd.,
    111 F. Supp. 2d 586 (E.D. Pa. 2000) ................................................26, 29, 33

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
    124 F.3d 430 (3d Cir. 1997)........................................................................36

**CASES**                                                                    **Page(s)**

Reiter v. Sonotone Corp.,
    99 S. Ct. 2326, 442 U.S. 330 (1974)......................................................................31

Rutman Wine Co. v. E. & J. Gallo Winery,
    829 F.2d 729 (9th Cir. 1987)...........................................................................19

Simon v. Eastern Kentucky Welfare Rights Organization,
    426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)......................................15, 18

Smith v. NCAA,
    139 F.3d 180 (3d Cir. 1998)..................................................19, 20, 25, 36, 37, 38

Spath v. NCAA,
    728 F.2d 25 (1st Cir. 1984).............................................................................30

TV Communications Network, Inc. v. Turner Network Television, Inc.,
    964 F.2d 1022 (10th Cir. 1992) .......................................................................19

Tanaka v. NCAA,
    252 F.3d 1059 (9th Cir. 2001) ........................................................................38

United States v. Brown Univ.,
    5 F.3d 658 (3d Cir. 1993)...............................................................................19

United States Parole Comm'n v. Geraghty,
    445 U.S. 388, 397, 100 S.Ct. 1202, 1209 (1980)........................................15, 18

Valley Forge Christian College v. Americans United for Separation of Church and State,
    454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)...................................14, 18

Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,
    156 F.3d 535 (4th Cir. 1998), cert. denied,
    526 U.S. 1066, 119 S.Ct. 1458 (1999)............................................................19

Warth v. Seldin,
    422 U.S. 490, 95 S.Ct. 2197 (1975)................................................................15

**STATUTES**

**Page(s)**

Fed. R. Civ. P. 12(b) ............................................................................................1

Fed. R. Civ. P. 12(b)(1)......................................................................................15

Fed.R.Civ.P. 12(b)(2).........................................................................................1

**STATUTES (Cont.)**                                                                                    **Page(s)**

Fed.R.Civ.P. 12(b)(6)..................................................................................................................19

Fed.R.Civ.P. 56.............................................................................................................1, 43, 45

15 U.S.C. § 15...........................................................................................................................25

28 U.S.C. § 1404(a) .....................................................................................................................1

524 U.S. 982 (1998)..................................................................................................................19

525 U.S. 459 (1999)..................................................................................................................19

## INTRODUCTION

The NCAA seeks an Order dismissing the Complaint pursuant to Fed. R. Civ. P. 12(b) and, in the alternative, for judgment in its favor pursuant to Fed.R.Civ.P. 56.[1] The NCAA is entitled to such an order because the Court lacks subject matter jurisdiction, because the Complaint fails to state a claim and because the NCAA is also entitled to summary judgment.

## FACTUAL BACKGROUND

### A.    The National Collegiate Athletic Association And Its Recruiting Rules

The NCAA is a voluntary unincorporated association of over 1,200 members[2], consisting of colleges and universities, conferences and associations and other educational institutions that administer rules regarding the conduct of the athletics programs of member institutions and their employees. The NCAA member institutions adopt rules in furtherance of the NCAA's purposes and fundamental policies set forth in the NCAA Constitution, which include, among others: "To encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism" and "[t]o supervise the conduct of, and to establish eligibility standards for, regional and national athletics events under the auspices of this

---

[1] The NCAA also objects to the Eastern District of Pennsylvania as improper venue because plaintiff has failed to plead adequate facts establishing venue in this district. The NCAA hereby moves to dismiss, therefore, pursuant to Fed.R.Civ.P. 12(b)(2). In the alternative, if the Court does not dismiss, the proper venue for this action is the NCAA headquarters located in Indianapolis, Indiana. Neither plaintiff resides in the Eastern District of Pennsylvania, none of the alleged facts took place in this district, and there are no other connections between this cause of action and the district. Therefore, the cause of action should be dismissed, or transferred to the United States District Court of for the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a).

[2] Member Institutions are divided into Divisions I, II, and III.

1

Association." Ex. 1.[3]  The NCAA membership takes its role in recruiting seriously and strives

to maintain the ideals of amateurism and competitive equity as provided in the NCAA

Constitution:

> The recruiting process involves a balancing of the interests of
> prospective student-athletes, their educational institutions and the
> Association's member institutions.  Recruiting regulations shall be
> designed to promote equity among member institutions in their
> recruiting of prospects and to shield them from undue pressures
> that may interfere with the scholastic or athletics interests of the
> prospects or their educational institutions.

NCAA Constitution, Article 2.11.   Supporting this broad design are the certification rules

applicable to basketball recruiting.

The NCAA recruiting bylaws deliberately emphasize recruiting of prospects during the

high school academic year and at the high school facilities where there remains a traditional

connection between academics and athletics, where substantial institutional controls are in place,

and where parents and high school officials, including coaches, teachers, guidance counselors,

and principals, can supervise.  Thus, much of the college recruiting that takes place happens

during the high school academic year. Ex. 2. The recruiting limits and conditions differ between

Division I, Division II and Division III colleges  -- Division I being the most strict (because of

the greatest professionalizing forces and most negative influences). Exs. 1, 3 & 4.

The Recruiting Bylaws governing recruiting by Division I institutions divide various

times into Contact periods, Evaluation periods, Quiet periods and Dead periods.   Ex. 1

(13.02.4.1-4).  Evaluation periods allow off-campus evaluation recruiting, but no contacts are

allowed.   During Quiet periods, if prospective student-athletes choose to visit a Division I

campus, an institutional staff member may meet with the athlete, but no off-campus recruiting is

---

[3] Citations to Exs. 1-14 are to exhibits submitted with the Declaration of Angie E. Grant
submitted herewith.  Citations to Exs. A-Q are to exhibits submitted with the Declaration of

allowed. During Dead periods, recruiting is not permitted. These periods reflect the NCAA's commitment to preventing recruiting from interfering with a prospects' academics and from being a constant interruption to their lives.

Starting at the academic year, beginning August 1 and lasting through September 8 is a Quiet period. As part of seeking recruitment, prospects can visit institutions and contact athletics staff on campus. From September 9 through October 9 is a Contact period when institutional athletics staff are allowed to recruit those prospects off-campus and arrange both personal contact and evaluations. October 10 through November 21 is a quiet period (recruiting on campus), excluding November 12-15 which is a dead period. Then the Evaluation period or the high school basketball season begins – Division I institutions have 70 evaluation days to divide among coaches and athletic staff who visit high school games and practices selected at their discretion between November 22 through March 15. Another Contact period follows from March 16 through 22, then a Quiet period lasts from the 23rd through April 3, except for the 28th through the 2nd which are a Dead period. Then, the rest of April is a Contact period, excluding the 8th through the 11th which are a Dead period. May 1 through July 7 are a Quiet period and, again, prospects may have contact with institutional staff on campus.

Then, during the month of July, two ten-day evaluation periods occur from July 8-17 and July 22 through the 31. During this time, coaches may attend non-institutional non-organized events such as pick-up games or other non-organized play. Ex. 1 (13.13.3.3). They can also attend private camps or events certified pursuant to 30.16. Ex. 1 (13.13.3). The 18th through the 21st are a dead period. Ex. 2.

Prospects, such as plaintiffs, are not affected and cannot be harmed, by certification or violations of the NCAA Bylaw. Rather, if there is a violation and a coach attends a private

Frederick R. Juckniess submitted herewith.

3

organized event that is not properly certified, the violation is an "institutional violation" but such a violation "shall not affect the prospect's eligibility." Ex. 1 (13.13.3).

Recruiting also includes Official and Unofficial visits to campus, the boundaries of which are defined by the Recruiting bylaws. Ex. 1 (13.7 & 13.8). Furthermore, telephone calls, faxes and other contacts are limited and defined by the rules. Ex. 1, Art. 13.

Recruiting also takes place in other ways. Although institutions' spending on recruiting is controlled by 13.15 of the Recruiting Bylaws, those Bylaws allow institutions to subscribe to published recruiting services (13.15.3.1) and may use paid video services to evaluate prospects. (13.15.3.2). These and other recruiting avenues make up the diverse and crowded market for prospective student athletes, camp operators and recruiting services.

### B.   Camps, Events and Recruiting Services

Plaintiffs' claims are based on the allegation that, if they do not play on a particular team in a certified tournament, they will be deprived of the opportunity to be seen by a Division I coach. In fact, plaintiffs have a myriad of camps, events, scouting and recruiting services for prospective student athletes available to them. Ex. 5, Exs. E-P.

First, there are a multitude of certified events which do not require a team and which promise exposure to Division I coaches. See Ex. 5, Ex. E, F, G, H, I J, K & L. Some even promise the "MAXIMUM EXPOSURE" (Ex. H) while others claim that exposure is "unmatched." Ex. J. Still others explain how "[c]ollege coaches flock to our events because they know that these are the best. . . For prospective college athletes, there is no better way to get seen than to play in one of our events." Ex. G, p. 2. Likewise, the plaintiffs in the pending case Pocono Invitational et. al. v. NCAA allege that this is what their camps for individuals provide. Some recruiting and scouting services are advertised as specifically affiliated with particular

4

summer basketball camps. Exs E, F, G & J. In fact, some send recruiting reports directly to colleges about the attendees. Ex. J. It is clear that, according to the industry itself, team events are not needed for exposure to Division I coaches. In fact, according to the individual camps themselves, they offer better exposure than tournaments. Ex. J ("AAU tournaments could have up to 4,500 players participating. It would take a superhuman coach to evaluate such a mass of basketball humanity. Contrast that with 'Blue-Chip' where only a select 288 campers are accepted each week."); Ex. H, I & K.

Secondly, there are a wide variety of camps which are not during the July evaluation period which offer recruiting and exposure to Division I coaches in other ways. For example, FutureStars promises the following to the attendees of its non-certified camps:

> Each player is evaluated by the *FutureStars* Staff and numerous college coaches in attendance. *FutureStars* follows up by mailing evaluations on all participants with college potential in a special edition of the *FutureStars* Scouting Service to over 1000 colleges and universities across the United States.

Ex. E, p.1. Similarly, the Bob Gibbons camps in June, which are not certified, offer the following exposure to college coaches:

> Every participant will receive a personal evaluation of his basketball skills and abilities from Bob Gibbons and his staff and, Bob Gibbons' ratings of each participant will be sent to over 300 colleges and universities!

Ex. F, p.1. Many of these camps are also designed to increase the skill levels of the participants so that they are able to play well enough to be capable of playing college-level basketball. Ex. E, H & I.

Third, regarding tournaments, there are indeed tournaments designed for the high school team which promise exposure to college coaches and recruiters. Ex. N. With all these

5

opportunities, tournaments for non-scholastic teams, such as those generally referred to by plaintiffs' Complaint, are but a tiny and unnecessary opportunity for prospective student athletes.

Fourth, even beyond the above, there are numerous sources which provide guidance as to what a prospective student athlete should do to obtain exposure to college coaches. Exs. O & P. These provide yet more opportunities by suggesting how to contact colleges and how to provide information exposing the talents of prospects to those colleges.

The opportunities for recruiting exposure are legion and represent a thriving competitive market. By no means are tournaments for non-scholastic teams essential, or even a significant part of the available opportunities.

### C.    Plaintiffs' Complaint

Plaintiffs Eric Henkel and Tyler Koenig are high school basketball players who want and hope to be recruited to play Division I basketball. Complaint, ¶9. In addition to their high school teams, they allege they are members of non-scholastic basketball teams (privately organized teams other than their high school teams) which are located outside their home states and are more than 100-miles from their home. Complaint, ¶29. Each plaintiff also alleges that it is "essential" to basketball players hoping to be exposed to recruiting and obtain scholarships from Division I schools "that he be seen by a Division I basketball coaches at NCAA-certified events." Complaint, ¶30. However, the only NCAA-certified events mentioned by plaintiffs are tournaments for non-scholastic teams. Plaintiffs allege no facts substantiating this allegation and ignore the myriad of other recruiting opportunities available.

Plaintiffs allege that an NCAA rule, 30.16(l), will prevent them from playing with their chosen non-scholastic teams at tournaments. This, they claim, will "preclude the plaintiffs . . . from displaying their skills and talents before Division I basketball coaches in the summer of

2002." Complaint, ¶32. They further deduce that the NCAA rule "will seriously jeopardize the ability of the plaintiffs . . . to obtain basketball scholarships to Division I Schools." Complaint, ¶33. They do not allege a single fact showing they could obtain a Division I Basketball Scholarship.

The NCAA rule is Bylaw 30.16(l), a subdivision of a broader rule that sets out requirements for summer camps to meet before the NCAA will agree to certify it as a place where Division I coaches may properly conduct recruiting activities. See, Complaint, ¶27-27. In particular, 30.16(l) requires that certified events limit the participants as follows:

> (l) Participants on nonscholastic teams must reside either within the state in which the team is located or within 100 miles of the participant's residence if the team is located outside the state in which the participant is a resident.

Complaint, ¶27.

Based on these few facts, plaintiffs allege that by adopting the recruiting camp certification Bylaw 30.16, with subsection (l), the NCAA has violated the Sherman Act § 1 because they have "engaged in, and are continuing to engage in, a continuing agreement, undertaking, and concert of action to unreasonably restrain the plaintiffs . . . from participating in events where they would be able to display their skills to Division I basketball coaches." Complaint, ¶61. Plaintiffs further allege that this conspiracy "will continue to have the effect of precluding the plaintiffs . . . from participating in NCAA-certified basketball tournaments in the summer of 2002 and from displaying their skills to Division I basketball coaches, thereby impairing their ability to obtain basketball scholarships." Complaint, ¶63.

**D.    NCAA's NONCOMMERCIAL Certification Requirements For Summer Camps and Events**

The history and background of the summer basketball environment was researched and reviewed for years by the NCAA and its subcommittees in making NCAA recruiting rules. See Ex. 7. Recounting only the recent history, in January 1998, the NCAA Management Council already was receiving reports from the Academics and Eligibility Cabinet and had decided that "recruiting and summer basketball camps involve complex, high-priority issues that require further study; agreed to refer the recommendations back to the Cabinet for a more global review with a broader perspective, using experts from outside the Cabinet; and asked for a progress report to the Management Council in April, including the issues discussed and the outside individuals involved."    Ex. 9 at ¶5a2(b).    In August 1998, the NCAA Division I Board of Directors created a blue-ribbon panel headed by Syracuse University Chancellor Kenneth Shaw to examine issues impacting the sport of basketball, including the summer recruiting problems. See Ex. 7; 14.    After a year of meetings and collecting information the Working Group developed proposals to deal with these recruiting issues. Ex. 14.

The NCAA membership does not pass new rules casually. See, e.g. Ex. 1, p. 46. Proposals such as the revised certification rules developed by a subcommittee must be approved by the Management Council, then the entire NCAA membership is given 90 days to comment, after which the Management Council votes again. If approved, the Board of Directors reviews the proposal and votes on it. If approved, there is another 60-day period for NCAA members to comment further and, if desired, to override the proposal. Id. Throughout this process, various individuals and groups are invited to provide additional information and facts are gathered from public sources. See, e.g. Ex. 1 & 7. Finally, if a proposal survives this intense scrutiny, the Board of Directors action is final.

8

The Working Group's initial proposals regarding recruiting were eventually adopted by the Board of Directors in April 2000. Ex. 7. They included modifications of the men's basketball recruiting calendar to provide more evaluation opportunities during the academic year and at the high schools and reduced evaluation days during the summer – however, 30.16 (l) was yet to come. The strengthened certification rule of which it was a part would result from the work of the NCAA Division I Basketball Issues Committee, which was created in April 2000 and which built on the Working Group's research and expertise. Ex. 14. The Board enlisted this new group to develop a better recruiting model to be implemented not later than 2002.

The NCAA's objectives for the new model included:

A.    Enhance the educational mission of intercollegiate athletics as it relates to the sport of Division I Basketball.

B.    Reduce outside influences (e.g. coaches, agents, "street agents," apparel and equipment companies) that place undue pressure on and negatively impact the development of basketball prospective student-athletes. . . .

* * *

D.    Increase the accountability of other athletics organizations (e.g., National Federation of State High School Athletic Associations, Amateur Athletics Union) involved in the oversight of prospective student-athletes.

Ex. 7 at 12480.

With the help of the NCAA national office, these groups gathered facts from many sources to develop their recommendations and, ultimately, the NCAA's new rules:

The staff organized an internal group that conducted a series of in-person interviews and group discussions with numerous entities that are involved in and/or impacted by the recruiting process. Among the entities that have provided input to the staff group are: The National Association of Basketball Coaches (NABC), a group of NABC head coaches, a group of NABC assistant coaches, the National Basketball Association (NBA), the National Basketball

9

> Player's Association (NBPA), the National Federation of State
> High School Associations (NFSHA), Amateur Athletic Union
> (AAU), apparel and equipment company representatives, camp
> operators, media representatives and representatives from the
> NCAA Division I Student-Athlete Advisory Committee and
> NABC Student Basketball Congress.

Ex. 7 at 12479. The information gathered included the observations, articles and interviews. For

example, statements by former "summer campers" were heard, discussing street agents,

exhausting summer schedules, and the detrimental impact on academics. Ex. 8. In fact, the

Student-Athlete Advisory Group representative recommended that "more stringent certification

requirements of summer events could be a solution" to problems with the summer environment

based on their assessment that "the summer environment creates an atmosphere where athletics

participation and achievements supercede the importance of education and academic

achievements." Ex. 8. The Final Report of this group describes their research and efforts in

some detail. Ex. 7.

Through this research and work, the Committee recommended four areas of focus for the

NCAA in its attempts to reach these objectives:

> A.  Educational Initiatives;
> **B.  Strengthen the Basketball Event Certification Process;**
> C.  Stronger Enforcement/Regulatory Measures
> D.  Accommodation Initiatives (Initiatives designed to improve
>     relationships between prospects and NCAA coaches, improve
>     relationships between secondary and higher education, and
>     improve relationships between developmental basketball programs
>     and intercollegiate athletics.)

Ex. 7 at 12481(emphasis added). By February 2001, the Committee had concluded that these

areas would provide "the best opportunity to change the current recruiting environment, thus,

minimizing nonscholastic influence and increasing exposure of men's basketball prospects to

those associated with secondary or higher education." Ex. 7 at 12481.

Although the NCAA Committee developed initiatives and rules in each of these areas, the Plaintiffs' Complaint is only concerned with recruiting certification bylaws and, in particular, 30.16(l). However, the purpose and nature of those bylaws must be viewed in the context of the whole. Among the specific recommendations by the Subcommittee to strengthen certification were the following:

- Establish a standard that requires participants on nonscholastic teams to reside either within the state in which the team is located, or within 100 miles of the participant's residence if the team is located outside the state in which the participant is a resident

- Require comprehensive and specific educational/mentoring activities to be conducted at each event

- Require greater accountability of individuals involved in summer coaching activities at certified events. Such individuals should be responsible to a particular organization (e.g. AAU certified)

- Establish regulations that prohibit any certified event or tour from being operated or managed by an agent

- Establish restrictions that preclude any certified event or tour from receiving financial support from an agent or any representative of a member institution's athletics interests.

Ex. 7 at 12483. These and other recommendations sought to shift the recruiting focus from the summer into the academic year when parents and high schools with their built-in institutional controls and standards could be involved to minimize the pernicious nonscholastic external influences. Ex. 7 at 12485. These purposes were clearly noncommercial.

The work and fact-gathering by the Committee and its recommendations made their way through the intense scrutiny and consideration of the public NCAA legislative process described above. Ex. 1, p. 46. After consideration and comment, in November 2001, the NCAA membership adopted the new certification rule 30.16 including subsection (l). Ex. 10. The rule

11

was limited to Division I recruiting (i.e. Division II and III coaches' recruiting was not affected by 30.16) since the influences compromising amateurism and competitive equity were tied to the higher profile of Division I basketball. The proposal explained its rationale in detail:

> **Rationale**: The proposal is part of a package of proposals **designed to decrease the impact of nonscholastic external influences** in the recruitment of prospective basketball student-athletes. The additional criteria for certification and the increased oversight of summer basketball camps and tournaments should **help ensure that such events are conducted in a manner that is more consistent with the Association's principles of amateurism**. . . . The establishment of a standard related to the residence of participants on nonscholastic teams should deter the practice whereby teams "rent" elite-level prospects for brief periods of time, often providing them payment in excess of actual and necessary expenses. The prohibition against basketball events or tours being operated or managed by agents and the requirement that individuals involved in coaching activities at such events have some accountability should **help to create a more healthy environment** that minimizes the outside influences that often exploit the prospective basketball student-athlete for personal gain. It is anticipated that the reduction in such influences in combination with other proposals to more fully develop the collegiate coach/prospect relationship during the academic year will increase the importance of the scholastic environment.

Ex. 10 (emphasis added). The new rule 30.16 went into effect in April 2002. It did not change the penalty for a violation (i.e. where a Division I coach attends a camp that violates certification rules). NCAA rules provide that "The violation shall be considered an institutional violation per Constitution 2.8.1; however, it shall not affect the prospect's eligibility." Ex. 1.

In addition to the fact that the recruiting bylaws are non-commercial in purpose, they also lack any commercial elements since certification is free. Decl. of J. Gentry, ¶2. Furthermore, attendance by Division I coaches for recruiting purposes is free and costs neither campers nor camps anything. Decl. of J. Gentry, ¶3-4. Finally, 30.16(l) by its terms applies only to team events such as tournaments. Ex. 10; Decl. of J. Gentry, ¶ 6. It does not apply to summer camps

attended by individuals, the kind of camp operated by the Plaintiffs in the <u>Pocono</u> case. The NCAA does not operate any team events or tournaments. Decl. of J. Gentry, ¶ 5.

Moreover, 30.16(l) may be waived by application under existing NCAA rules. NCAA rules allow a member institution, conference or committee to submit a request to the NCAA Division I Administrative Review Subcommittee (ARS) for a waiver of the rule. Ex. 1 (5.4.1.4); Decl. of J. Gentry, ¶ 10. The NCAA basketball committee submitted applications for waivers of 30.16(l) submitted on behalf of Mr. Henkel and Mr. Koenig as well as two others. Decl. of J. Gentry, ¶7-9. The NCAA's website contains additional information describing this procedure. Ex. 12.

**Bylaw 30.16(l)**: limits certification of tournaments to those where non-scholastic teams consist of student-athletes who live either in the state in which the team is located or within 100 miles of the team's location if the athlete lives in a different state. The commissioner of the Big Ten summarized part of the rationale in 1998: "we do not want to encourage by our presence third parties transporting 15 or 16 year olds all over the country for evaluation purposes." Ex. 13. In addition, the rule is intended to protect amateurism, reduce the damage to academics caused by exhausting play schedules and extensive travel, curb abuses of the summer basketball system in which non-scholastic teams, largely unregulated, attempt to "stock" their teams with star players from all over the country, perhaps through improper payments, gifts and rewards. Ex. 7. As the rationale stated: "The establishment of a standard related to the residence of participants on nonscholastic teams should deter the practice whereby teams "rent" elite-level prospects for brief periods of time, often providing them payment in excess of actual and necessary expenses." Ex. 10. Bylaw 30.16(l) is a well-considered part of the set of NCAA Recruiting Bylaws designed to help clean up summer basketball, prevent professionalization of

the sport, maintain the connection between academics and athletics and preserve the principles of amateurism which are at the core of the NCAA's mission.

## DISCUSSION

Messrs. Henkel and Koenig's claims are nominally based on the Sherman Antitrust Act. The NCAA recruiting rule they challenge, however, is noncommercial in nature. It is part of a set of bylaws which define who is eligible for NCAA recruiting and which are designed to protect the amateur character of collegiate sports and preserve the connection between academics and athletics. Since noncommercial rules are not restraints "of trade or commerce" subject to Sherman Act scrutiny, their Complaint fails to state a claim.

Furthermore, plaintiffs' claim that 30.16(1) will affect them is also moot – they applied for and received waivers from the NCAA. Decl. of J. Gentry, ¶7-8; Exs. A-E. For this reason the claims must be dismissed for lack of subject matter jurisdiction. In the alternative, the NCAA is entitled to summary judgment in its favor for the same reason.

Furthermore, plaintiffs fundamentally lack antitrust standing since student-athletes cannot be professionals or be paid for their participation. Thus, the alleged "opportunity" to be observed by a Division I coach in the hopes of being recruited cannot be "business or property" within the meaning of the Sherman Act. For these reasons, as well as the several other grounds set forth in the memorandum below, the NCAA respectfully submits that plaintiffs' Complaint fails to state a claim, is meritless, and should be dismissed with prejudice. In the alternative, the NCAA is entitled to summary judgment on the same grounds.

## I.    THE COURT LACKS SUBJECT MATTER JURISDICTION SINCE THERE IS NO CASE OR CONTROVERSY.

Plaintiffs' claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because the Court lacks subject matter jurisdiction.  The federal judiciary lacks subject matter jurisdiction where there is no "case or controversy" under Article III of the United States Constitution.  To establish an Art. III case or controversy, a litigant first must clearly demonstrate that he has suffered an "injury in fact."  That injury must be concrete in both a qualitative and temporal sense, and, therefore, the plaintiff must allege an injury to himself that is "distinct and palpable," Warth v. Seldin, 422 U.S. 490,  501, 95 S. Ct. 2197, 2206 (1975), as opposed to merely "[a]bstract," O'Shea v. Littleton, 414 U.S. 488, 494, 94 S. Ct. 669, 675 (1974), and the alleged harm must be actual or imminent, not "conjectural" or "hypothetical."  Los Angeles v. Lyons, 461 U.S. 95, 101-102, 103 S. Ct. 1660, 1664-1665 (1983).  Further, the litigant must satisfy the "causation" and "redressability" prongs of Art. III by showing that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."  Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38-41, 96 S. Ct. 1917, 1924-1926 (1976); Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S. Ct. 752, 758-59 (1982).  The  litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements.  A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.  See Warth, supra, 422 U.S., at 508, 518, 95 S. Ct., at 2210, 2215.

In the instant case, the Court lacks subject matter jurisdiction for several reasons:  (1) Plaintiff's claim is moot;  (2) Plaintiffs' alleged injury is too conjectural to be a true case or controversy pursuant to Article III;  (3)  Plaintiffs' factual allegations fail to establish any causal connection between their alleged injury and the alleged violation of the Antitrust laws.

### A. The Court Lacks Subject Matter Jurisdiction Because Plaintiffs' Claims Are Moot.

Plaintiffs lack standing since their claim is moot. The Court may take judicial notice that the certified events of the summer of 2002 are done – the NCAA's evaluation period ended July 31. See www.ncaa.org; Ex. 2; Ex. 5. The Complaint only seeks injunctive relief for this summers' events. Indeed, plaintiffs concede they will not play in certified events to obtain scholarships next summer. See, Complaint, ¶¶42, 58. Therefore, there is no case or controversy.

Furthermore, the class allegations do not alter this analysis. Where a plaintiff seeks to represent a class, but the claim is moot to him, the claim must still be dismissed. Banks v. NCAA, 977 F.2d 1081, 1085-86 (7th Cir. 1992). This rule applies in the instant case as well and deprives this court of subject matter jurisdiction pursuant to Article III of the United States Constitution.

Mootness has been defined as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" Banks, 977 F.2d at 1085 (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S. Ct. 1202, 1209 (1980)). A case becomes moot "when the controversy between the parties is no longer live or one of the parties lacks a personal stake in the outcome of the suit." Id. Here, the claims by Henkel an Koenig are moot – the summer certification period is over, they will not play next summer, and 30.16(l) was waived with respect to them.

Plaintiffs' counsel have asserted to this Court that "while Messrs. Henkel and Koenig may have obtained the relief they were seeking, the case is still alive as to the class" claiming Geraghty, *supra*, stands for that proposition. Plaintiffs are wrong. Mootness may be avoided if

certification is sought "prior to expiration of the named plaintiff's personal claim." Geraghty, 445 U.S. at 398, 100 S. Ct. at 1210. That did not happen here.

Class allegations even without certification may save a claim from dismissal for mootness, but only in the following narrowly-defined circumstances:

> When the claim on the merits is 'capable of repetition, yet evading **review**,' the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation . . . [but only] where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may rise again with respect to *that plaintiff* . . .

Banks, 977 F.2d at 1085 (emphasis in original) (quoting Geraghty, 445 U.S. at 398, 100 S. Ct. at 1209).

This exception to Article III does not apply in the instant case. Plaintiffs were not subject to 30.16(l) because they applied for and received waivers. Moreover, plaintiffs will never again be subject to 30.16(l) because this is the last summer that they will play in certified tournaments. Complaint, ¶42, 58. Therefore, plaintiffs' claims should be dismissed.

### B.    Plaintiffs Do Not Allege an Injury-In-Fact

Furthermore, plaintiffs have no injury-in-fact because they were not subject to 30.16(l). Because they applied for and received waivers, they were able to play on the non-scholastic team of their choice. Exs. A-E. Therefore, even accepting the allegations as true, plaintiffs do not have standing or any case or controversy.

Moreover, as pled, the Complaint fails to identify anything beyond the conjectural lost opportunity of the possibility of being seen by a Division I Coach. Such a lost opportunity is insufficient to be an injury in fact to generate a case of controversy for Article III purposes.

Finally, plaintiffs' Complaint assumes that plaintiffs could obtain a scholarship if they are observed by Division I coaches, but there are no facts pled supporting this assumption.

Therefore, there can be no associated injury in fact.[4] Therefore, there is no case of controversy upon which to invoke subject matter jurisdiction under Article III.

### C.    Plaintiffs Do Not Allege Facts Demonstrating Causation

Plaintiffs must plead facts demonstrating that the NCAA caused their "injury." Such facts are missing from the Complaint. Rather, plaintiffs plead that their injuries are the result of the non-existence of any non-scholastic team nearby, which was not caused by NCAA. In fact, plaintiffs were free to form their own team. In fact, plaintiffs' fail to plead facts showing they were unable to form their own team. And in the case of Mr. Koenig, there are no allegations that no other teams were available that attended or could have been encouraged to attend certified tournaments. Since the Complaint lacks allegations demonstrating how the NCAA caused the alleged lost opportunities, the plaintiffs' Complaint must be dismissed. See Simon, 426 U.S. 26, 38, 41, 96 S. Ct. 1917, 1924-26; Valley Forge, 454 U.S. at 472, 102 S. Ct. at 758-59.

### II.    PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In ruling on a motion to dismiss for failure to state a claim all facts alleged in the complaint are accepted as true and viewed in a light most favorable to the plaintiff. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990). However, the court need not accept "bald assertions" or "legal conclusions." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997). The Complaint of Henkel and Koenig has very few factual allegations and relies primarily on reciting legal conclusions which cannot sustain their claims. "If the alleged facts 'do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." Kingray,

---

[4] While this alone demonstrates the lack of any case or controversy, additional reasons why an injury in fact is absent from the claims at issue is discussed, *infra*, at Sec. II.B.1.

Inc. v. NBA, Inc., 188 F. Supp. 2d 1177, 1186-87 (S. D. Cal. 2002) (quoting Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987)); Banks v. NCAA, 977 F.2d at 1093. As another court explained "[a] plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1024 (10th Cir. 1992).

Plaintiffs' claims under the antitrust laws should be dismissed with prejudice for failure to state a claim under Fed.R.Civ.P. 12(b)(6) at the threshold because the challenged recruiting bylaw is noncommercial and therefore not subject to the antitrust laws. Smith v. NCAA, 139 F.3d 180, 185 (3d Cir. 1998), vacated on other grounds,[5] 525 U.S. 459 (1999).[6] Furthermore, plaintiffs fail to plead facts supporting any of the essential elements of a Sherman Act claim, most of which do not even appear in conclusory fashion. Even a thorough review of plaintiffs' Complaint reveals there is no antitrust injury even identified. The plaintiffs' "business or property" is not specified. There is no allegation of anticompetitive effect or injury to

---

[5] The plaintiff in Smith brought claims under both the Sherman Act and Title IX. The Supreme Court denied the plaintiff's request for certiorari on the dismissal of her Sherman Act claim and considered only the Title IX issues. See 525 U.S. 872 (1998); 524 U.S. 982 (1998).

[6] The Supreme Court has long recognized that the Sherman Act "is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations...which normally have other objectives." Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 n.7 (1959). Thus, while courts have applied the Sherman Act to nonprofit organizations (including the NCAA) when those organizations engaged in commercial activities, they have also held that the noncommercial activities of such organizations should not be subject to antitrust scrutiny. See e.g., Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 540-41 (4th Cir. 1998), cert. denied, 526 U.S. 1066, 119 S. Ct. 1458 (1999) (finding that a straightforward interpretation of the Sherman Act indicates that noncommercial activities of nonprofit organizations are not subject to antitrust liability); Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 63-66 (2d Cir. 1997) (recognizing that if the nature of an activity is noncommercial and has only incidental effects on commerce, antitrust law does not apply); United States v. Brown Univ., 5 F.3d 658, 665 (3d Cir. 1993) (although nonprofit organizations not entirely exempt from the Sherman Act, "when they perform acts that are the antithesis of commercial activity, they are immune from antitrust regulation.").

competition. There is no relevant market. The Complaint evidences a sham cause of action rather than a legitimate, well-pled claim under the antitrust laws and it should be dismissed with prejudice.[7]

### A.    Plaintiffs' Claims Must Be Dismissed Since the Challenged Bylaw is Noncommercial and Not Subject to the Sherman Act.

While the NCAA may be subject to the antitrust laws, its noncommercial activities are not. Where a plaintiff challenges the NCAA's noncommercial bylaws under the Sherman Act, that claim may properly be dismissed as a matter of law. Smith, 139 F.3d at 186-87.

In Smith, the Third Circuit rejected a challenge to the NCAA's post-baccalaureate eligibility rule, which prohibited an athlete from competing at a postgraduate institution other than the institution from which she received her degree. The Court stated:

> [E]ligibility rules are not related to the NCAA's commercial or business activities. Rather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics. Based on the Supreme Court's recognition that the Sherman Act was primarily intended to prevent unreasonable restraints in "business and commercial transactions"...and therefore has only limited applicability to organizations which have principally noncommercial objectives...we find that the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements.

139 F.3d at 185-86. Several other courts have come to the same conclusion. See College Athletic Placement Svc., Inc. v. NCAA, 1974 WL 998, *2, *3 (D. N.J. 1974)(holding that the NCAA's adoption of recruiting bylaws furthering its noncommercial objectives are not within purview of antitrust law), aff'd, 506 F.2d 1050 (3d Cir. 1974); Bowers v. NCAA, 9 F. Supp. 2d 460, 497 (D. N.J. 1998) (eligibility rules not subject to Sherman Act scrutiny); Gaines v. NCAA,

---

[7] Dismissal with prejudice would be proper in particular because any attempt to amend these facially frivolous and unsupported claims would be futile. See Smith 139 F.3d at 190.

746 F. Supp. 738, 744-46 (M. D. Tenn. 1990) (same); Jones v. NCAA, 392 F. Supp. 295, 303 (D. Mass. 1975) (same).[8]

The Supreme Court itself has acknowledged that many of the activities of the NCAA, particularly those involving amateurism, recruiting, and the conduct of athletic contests, are necessary for the "separate product" of amateur collegiate competition to exist at all. See NCAA v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85, 101-102, 104 S. Ct. 2948, (1984). The Board of Regents Court distinguished a commercial television football plan from "rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture," noting that a commercial television football plan "did not fit into the same mold" as the presumptively procompetitive second category of rules. Id. at 117 ("It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics.") This distinction controls the instant case -- recruiting and eligibility rules are inherently noncommercial because they are promulgated by the NCAA pursuant to its core authority to regulate the manner in which collegiate sports are carried out and to organize

---

[8] Nor has the commercial noncommercial distinction been limited to NCAA regulations: The Courts of Appeals have in several different contexts held that the Sherman Act does not apply to noncommercial activities. See e.g., Marjory Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. and Secondary Sch., Inc., 432 F.2d 650, 654 (D.C. Cir. 1970); M&H Tire Co. v. Hoosier Racing Tire Co., 733 F.2d 985, n.8 (1st Cir. 1984); Nat'l Org. of Women, Inc. v. Scheidler, 968 F.2d 612, 620-621 (7th Cir. 1992), rev'd on other grounds, 510 U.S. 249 (1994); Missouri v. Nat'l Org. of Women, 620 F.2d 1301 (8th Cir. 1980), cert. denied, 449 U.S. 842 (1980); Dedication & Everlasting Love to Animals v. Humane Soc'y of the U.S., 50 F.3d 710, 714 (9th Cir. 1995).

the efforts of its member institutions and therefore are not subject to Sherman Act scrutiny.[9]

Likewise, courts have recognized that recruiting rules are part of the NCAA's noncommercial mission:

> Detailed rules regarding the recruiting of high school athletes is an integral part of the NCAA's rules. Thus, recruiting rules, as do many other of the NCAA's rules, vindicate the association's legitimate interest in educational values This Court concludes that restrictions regarding a member institutions' contact and encouragement of high school athletes to attend its institution is rationally related to the NCAA's fundamental purpose of promoting *both* educational and athletic values.

Hawkins v. NCAA, 652 F. Supp. 602, 615 (C. D. Ill 1987); College Athletic Placement, 1974 WL 998 at *2, *3 (holding that the NCAA's recruiting related rules not within purview of antitrust law); see also, Board of Regents, 468 U.S. at 88-89, 104 S. Ct. at 2953-54 (distinguishing "regulations concerning recruitment of athletes" from regulations regarding televising athletic events).

---

[9] Those who sue the NCAA regularly cite Law v. NCAA. However, like Board of Regents, the Law case involved commercial regulations separate and distinct from recruiting, amateurism and eligibility rules. There, the NCAA was found to have adopted a salary cap for restricted earnings coaches which fixed the price that member institutions could pay to those coaches. Law v. NCAA, 134 F.3d 1010 (10th Cir. 1998). But Law distinguished the noncommercial "rules forbidding payments to athletes and those requiring that athletes attend class, etc." from the "naked price fixing" of the restricted earnings rule. Where the rule in Law set a price, the recruiting bylaw that requires that camps be certified before a Division I coach may conduct recruiting activities does not set any prices. In fact, just like the "rules forbidding payments to athletes" which the Law court recognized were not commercial and were distinct from the restricted earnings rule, 30.16 itself requires certified camps to agree that they will not pay campers to play. 30.16(c)("No air or ground transportation or other gifts or inducements shall be provided to the event participants"). Similarly, the rule requires that the event operator agree it will not let a sports agent run the camp, which would effect the eligibility of the prospects. 30.16(i)("The event or tour shall not be operated or managed by any individual or agency involved in the marketing of any individual's athletics reputation or ability"). And the purpose of 30.16(l) is to prevent and discourage such payments. Ex. 10. Such recruiting rules are the very same type of rules concerning payments to athletes and eligibility which Law and Board of Regents recognized as distinct from commercially-directed regulations.

The distinction is valid even when the NCAA's noncommercial activities may have an indirect effect on commerce. An incidental or indirect effect on commerce is not enough to subject an otherwise noncommercial activity to Sherman Act scrutiny. See e.g., Apex Hosiery v. Leader, 310 U.S. 469, 491-502, 60 S. Ct. 982 (1940) (transportation strike not subject to Sherman Act scrutiny, even though it had a drastic effect on the hosiery market, because it "was not intended to have and had no effect on prices of hosiery in the market"); Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. and Secondary Sch., Inc., 432 F.2d 650, 654 (D.C. Cir. 1970), cert. denied, 400 U.S. 965 (1970) (Sherman Act does not apply to college accreditation decisions even though they have an incidental effect on commerce).[10]  Again, this holds true for the NCAA's recruiting bylaws. College Athletic Placement, 1974 WL 998 at *2, *3.

Thus, if 30.16(l) actually restrained trade, any effects of that recruiting bylaw would only be indirect and insufficient to support a Sherman Act claim. In a case affirmed by the Third Circuit, the College Athletic Placement court held that where recruiting rules restrained the market for services that solicited recruiting for college athletic scholarships, that restraint was indirect and "inherent in the adoption of a rule by the NCAA for the purpose of furthering the noncommercial objectives of the organization." College Athletic Placement, 1974 WL 988 at *3 & 5. There, the plaintiff sold the service of locating athletic scholarships in return for payment of a fee. Id. at *1, n.1. The NCAA, in acting to protect amateurism, amended its constitution to render athletes that used such recruiting-for-money organizations ineligible for college athletics under the no-agent rule. Plaintiff sued for injunctive relief under §§1 and 2 of the Sherman Act.

---

[10] See also, M&H Tire Co. v. Hoosier Racing Tire Co., 733 F.2d 985, n.8 (1st Cir. 1984) ("if football teams and owners 'combine' to change the rules of the game to eliminate expensive equipment and generally to simplify the sport, we cannot conceive an antitrust violation simply because of its economic impact on suppliers").

In rejecting the claim, the court found that the only alleged commercial impact due to the noncommercial rule was indirect: "The NCAA's operation is structured in such a manner as to promote amateurism in college sports as it relates to education on a national scale. The effect the NCAA might have on third parties and on competition is at best indirect." Therefore, the recruiting regulation did not violate the Sherman Act since the only effect was incidental to the noncommercial objectives of the NCAA. Id. at *6.

The NCAA recruiting regulation at issue in this motion, 30.16(l), is exactly the sort of noncommercial NCAA bylaw that is not within the purview of the Sherman Act. The Complaint does not indicate otherwise. The evidence detailed above about their background, the circumstances under which they were passed, and their purpose and rationale, all demonstrate they are noncommercial in purpose and nature. These Bylaws condition some of the recruitment activities by Division I Basketball coaches and set out the parameters by which summer camps can become certified for those noncommercial recruitment activities. Ex. 1. Certification itself is free – event operators do not pay for certification. Decl. of J. Gentry, ¶2. Furthermore, the event operators do not pay for the attendance of Division I coaches for recruiting purposes – the potential benefit of certification. Decl. of J. Gentry, ¶3. Nor do campers such as plaintiffs pay for this input. Decl. of J. Gentry, ¶4. Certification is not something for the camps to sell, but a recruiting guideline for Division I coaches to determine where they may recruit. There simply is nothing commercial about the recruiting bylaw at issue.

Therefore, where the NCAA membership determines the types of events at which Division I coaches can conduct any permitted recruiting activities, it is not "commercial activity." The preservation of amateurism and the protection of student-athlete welfare are two of the functions of the NCAA, and neither of these has a commercial element. Likewise, the

24

NCAA membership has an interest in removing itself from the recruitment of players from far-flung areas who are flown-in to form semiprofessional teams of "star" high school players. The certification bylaws are necessary for the NCAA to curtail the growing "professionalization" of its recruiting activities. They are outside of Sherman Act scrutiny because, like the eligibility rules, they "are designed to preserve the honesty and integrity of intercollegiate athletics and foster fair competition among participating amateur college students." Banks, 977 F.2d at 1090; see also, Smith, 139 F.3d at 185 ("Rather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics."). Moreover, as described in detail above, the certification bylaws and specifically 30.16(l) seek to maintain the connection between athletics and academics by removing NCAA Division I recruiting as an incentive to prospective student athletes to spend summers far from home, sacrificing academics and playing grueling 100-game schedules in geographically distant locales. Exs. 7, 8, 10 & 14. They are thus noncommercial regulations, and should not, therefore, be subject to Sherman Act scrutiny. Therefore, plaintiffs' claims must be dismissed for failure to state a claim under the Sherman Act.

### B.    Plaintiffs Have Failed to Plead Facts Which Could Support Standing to Challenge Recruiting Rules Under the Sherman Act.

An antitrust plaintiff must have "antitrust standing", which is more than constitutional standing, in order to bring its claims under the antitrust laws. Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983); see also, Blue Shield of Virginia, Inc. v. McCready, 457 U.S. 465, 477 (1982). The constitutional doctrine of standing serves to identify cases and controversies that are justiciable under Article III. An "irreducible constitutional minimum of standing" is that "plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

25

imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992) (quotations and citations omitted). These concerns have led the Court to construe the antitrust standing conferred by the Clayton Act, as not extending to injuries that are too remote or indirect or speculative. See e.g., Associated Gen'l Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535-46, n.31, 103 S. Ct. 897 (1983). Accordingly, standing under the Clayton Act is more limited than under Article III. Id. ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.").

The antitrust standing doctrine requires that, in order to bring an antitrust claim, a plaintiff must not only be threatened with commercial injury injured by the defendant's conduct, but must also be a proper plaintiff. Courts consider five factors in determining whether an antitrust plaintiff satisfies the antitrust standing requirement: (1) "injury to business or property"; (2) the "causal connection between an antitrust violation and the harm alleged"; (3) "the directness of the injury"; (4) the "existence of an identifiable class of persons [whose] self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; and (5) "the potential for duplicative recovery or complex apportionment of damages." Precision Surgical, Inc. v. Tyco Int'l, Ltd., 111 F. Supp. 2d 586, 588 n.4 (E. D. Pa. 2000) (citing Assoc. Gen. Contractors, 459 U.S. at 537); In re Warfarin Sodium Antitrust Litig., 214 F.3d 395 (3d Cir. 2000)).

In addition, plaintiffs must have "antitrust injury." To demonstrate antitrust injury, plaintiffs must show that they have "sustained an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Precision

26

Surgical, 111 F. Supp. at 588 (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1977)). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." Id.; see also, Pace Elecs., Inc. v. Canon Computer Sys., 213 F.3d 118 (3d Cir. 2000) ("The Supreme Court has inquired whether the injury alleged by the plaintiff 'resembles any of the potential dangers' which led the Court to label the defendants' alleged conduct violative of the antitrust laws in the first instance.")(quoting Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990)).

Antitrust injury is necessary to, but not sufficient for, a finding that a plaintiff has antitrust standing. The instant plaintiffs have shown neither the elements for antitrust standing nor antitrust injury.

### 1.    Plaintiffs Fail to Plead Any Injury-In-Fact.

Plaintiffs' allegations are missing any essential facts which could establish an injury in fact. The only allegation is that "[e]nforcement of the 100-mile rule will seriously jeopardize plaintiff Henkel's ability to receive a Division I basketball scholarship." Complaint, ¶¶45, 59 (Koenig). There is no allegation of enforcement, no allegation of their ability to receive a scholarship, and no allegation that they have lost or will lost a particular scholarship. For these reasons alone, the Complaint fails to identify any injury in fact.

Furthermore, plaintiffs allege that it is "essential" that they "be seen by a Division I basketball coaches at NCAA-certified events" but do not plead that 30.16(l) prevents them from attending any certified events. Complaint, ¶30. Nor do they plead that it is their only opportunity for exposure or recruiting. Rather, they only claim they will be unable to play with a particular team at certified summer team events. The Court may take judicial notice of the numerous individual certified camps, which do not require a team, such as those at issue in

Pocono Invitational et al. v. NCAA, Case No. 00-CV-5708. Moreover, the NCAA list of certified events demonstrates that most of the events are not tournaments, but individual camps. Ex. 5; see also, Exs. E-J. Finally, the allegations fail to show that plaintiffs could not be recruited during the rest of the recruiting contact and quiet periods during the fall, winter and spring. See Ex. 1.

In addition, Mr. Henkel's allegations are missing something crucial. He alleges that there is a team he planned to play on and that that team is out of state and more than 100 miles from home. He also alleges that that team planned to play in three certified events. He does not allege, however, that there would in fact be any Division I coaches attending the alleged events or that any particular Division I coach in attendance would give Mr. Henkel a scholarship for playing in that tournament. Instead, Mr. Henkel's allegations reveal that there is only a chance of being seen. Complaint ¶44. Any actual loss of an opportunity to be seen does not appear in the factual allegations. Any injury in fact stemming from such lost opportunity is missing from the Complaint.

Similarly deficient, Mr. Koenig does not even allege that his chosen team will play in any certified tournament. Nor does Mr. Koenig plead that he could not play on another team or attend other certified events. Finally, the crux of Mr. Koenig's claim is: "If plaintiff Koenig is prevented from playing in NCAA-certified events because of the 100-mile rule, he will have lost his last significant opportunity to be observed by Division I coaches." Complaint, ¶58. This conjectural injury fails to adequately allege an injury-in-fact attributable to the NCAA bylaw sufficient to support jurisdiction.

Because plaintiffs' factual allegations fail to even establish a lack of recruiting opportunities, nor even an injury that is more than speculation or conjecture, they have failed to establish a live case or controversy for purposes of Article III jurisdiction.

### 2. Plaintiffs Fail to Plead an Injury to "Business or Property

Where an antitrust plaintiff fails to plead facts establishing antitrust injury, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful", the complaint may properly be dismissed. Precision Surgical, Inc. v. Tyco Int'l, Ltd., 111 F. Supp. 2d 586 (E. D. Pa. 2000). While the facts pled need only establish a threatened loss in the case of Section 16 of the Clayton Act, the injury must still be to ones business or property in order to be loss or damage "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful. Cargill, inc. v. Monfort of Colorado, Inc., 107 S. Ct. 484, 490, 479 U.S. 104 (1986). As the Supreme Court explained, under the Clayton Act a private plaintiff may only "secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." Id. at 490. Here, plaintiffs fail to establish such a threatened injury.

First, plaintiffs do not have any "business or property" which will be injured by the NCAA recruiting bylaws regarding certification. Henkel alleges a "desire to play" with the Eastern Washington elite because he "would greatly benefit" from playing on that team "in certified tournaments" this summer and because "this will be his last opportunity to be observed by Division I coaches." Complaint, ¶¶ 42-46. Similarly, Koenig has "hopes" of a Division I scholarship but says "if" he is "prevented from playing in NCAA-certified events" than "he will have lost his last significant opportunity to be observed by Division I coaches." Complaint ¶¶,

53-59.  None of these allegations identify any "business or property" for purposes of their antitrust claim.

Secondly, the "hope" of a scholarship or a vague chance of being observed by a Division I coach at a particular event with a particular non-scholastic team does not constitute a "business" nor is it "property" under the antitrust laws.  And numerous courts have held that there is no property right to participate in intercollegiate sports.  See Herbert v. Wentatuolo, 638 F.2d 5 (1st Cir. 1981).[11]  In fact, the Herbert court sanctioned the plaintiffs for appealing denial of an injunction where they could not establish how such a property right could arise under state law. 638 F.2d at 6-7.

Third, finding that plaintiffs had a business or property would directly contradict NCAA rules.  By claiming that the opportunity to play collegiate basketball is their "business" or that they have a "property" interest, they threaten their own eligibility.  The NCAA Constitution explains the "Principle of Amateurism" as follows:

> Student-Athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived.  Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises.

---

[11] See also, Graham v. NCAA, 804 F.2d 953, 959 n. 2 (6th Cir. 1986);  Jones v. Wichita State Univ., 698 F.2d 1082, 1086 (10th Cir. 1983); Hamilton v. Tennessee Sec. Sch. Athl. Assoc., 552 F.2d 681, 682 (6th Cir. 1976); Spath v. NCAA, 728 F.2d 25 (1st Cir. 1984) (because there is no fundamental right to education, there cannot be a fundamental right to play intercollegiate sports); Parish v. NCAA, 506 F.2d 1028, 1034 (5th Cir. 1975) ("the privilege of participating in interscholastic athletics must be deemed to fall . . . outside the protection of due process"); Hawkins v. NCAA, 652 F. Supp. 602 (C. D. Ill. 1987);  Colorado Seminary v. NCAA, 417 F. Supp. 885, 895 (D. Colo. 1976) (student athletes have no constitutionally protected property or liberty interest in participation in intercollegiate athletics), aff'd 570 F.2d 320 (1978); Knapp v. Northwestern Univ., 1996 WL 495559, at *2 (N. D. Ill. Aug, 28 1996), rev'd on other grounds, 101 F.3d 473 (7th Cir. 1996), cert. denied, 117 S. Ct. 2454 (1997) (possibility of obtaining professional career through basketball "too speculative to even constitute a present economic interest.").

Ex. 1, NCAA Const. Art. 2.9. The assertion of "business or property" is antithetical to one of the

central missions of the NCAA and plaintiffs challenge their very eligibility to play college sports

by claiming their interest therein constitutes their "business or property." By even claiming they

are in "business", they renounce a cornerstone of what makes them eligible to play college

sports. Likewise the NCAA eligibility rules prohibit athletes from having an agent, from being

paid and require the revocation of eligibility where a prospective student athlete was either paid

or represented by an agent prior to participating in college basketball. Ex. 1, 12.02, 12.1, 12.3. [12]

　　　In addition to no business or property of the type protected by the antitrust laws, plaintiffs

do not plead, and cannot establish, that an ineligibility to play with a particular team in a

particular event would be the proximate cause of the alleged injury of lost opportunity to be

observed and to thusly obtain a scholarship. That failure is also fatal to a finding of antitrust

injury and requires dismissal. See, Justice v. NCAA, 577 F. Supp. 356, 377-78 (D. Ariz.

1983). [13] The Justice court wisely recognized that a similar claim for an ineligibility due to

NCAA rules could not proximately cause a failure to obtain a professional sports contract and

granted summary judgment. Id. at 384. It stated:

---

[12] Plaintiffs have relied on Reiter v. Sonotone Corp., 99 S. Ct. 2326, 442 U.S. 330 (1974) to
support their argument that they have an "injury to business or property" sufficient to satisfy
antitrust standing. Reiter, however, held only that consumers who are illegally overcharged in
their retail purchases may have an antitrust injury because "property" includes "money." In fact,
that Court held that "business or property" is restrictive, noting as an example that personal
injuries were not "business or property" redressible by the antitrust laws. Id. at 2331.

[13] The Justice court applied a looser standard for injury when examining antitrust standing under
§16 of the Clayton act – an approach which was tightened by Cargill, Inc. v. Monfort of
Colorado, Inc., 479 U.S. 104, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986). The Cargill Court made it
clear that §16 of the Clayton Act requires the same showing of injury to "business or property"
as defined by §4 of the Clayton Act. Even under the broader standard applied in Justice, the
plaintiff-athletes failed to carry their burden.

If, for example, it were likely that the plaintiffs would be offered professional contracts based on professional scouts' observations of their performance in practice sessions, in regular season or post-season all-star games or on game films, the plaintiffs would not meet the proximate cause requirement of the standing test.

A similar result would obtain if the University of Arizona football team's regular season performance was not good enough to prompt one of the bowl game committees to issue an invitation to the team.

Assuming that the team's performance did warrant a bowl invitation and that it was selected to play in post-season competition, a less than outstanding performance in the post-season game or simply a perceived lack of ability to play professional football could also cause the plaintiffs not to be offered a professional contract.

In sum, there are simply too many factors other than the NCAA sanctions and the alleged injury for this Court to find that a proximate relationship exists.

Id. at 377-78.  For the same reasons, plaintiffs in the instant case have no antitrust injury and, therefore, no antitrust standing.

The claimed injury is also too remote to state a claim against the NCAA. The claimed lost opportunity requires a chain of events too long for there to be a direct injury.  For the claimed injury to happen, the following would be necessary (1) Plaintiff is and remains eligible under NCAA rules to play as a student-athlete (2) the Plaintiff is sufficiently talented to both play Division I basketball and obtain one of a limited number of scholarships (3) plaintiff has the resources to travel out of state for the summer (4) the only team to which they have access is out of state and more than 100 miles from home (5) the certified tournament operator would bar plaintiffs from playing despite having accepted the team application; (6) Division I coaches who would offer plaintiffs a scholarship actually appear at the team's chosen tournament(s) (6) If the Division I coach observed plaintiff play with this team, he would offer Plaintiff a scholarship (7)

nothing other than the failure to observe this player at this tournament with this team was the cause of not obtaining a scholarship. If all of these could be proven and plaintiffs were denied a scholarship offer, it would still be too indirect to satisfy an antitrust injury.

In light of the foregoing, plaintiffs are also unable to demonstrate any antitrust injury. More than an actual injury (assuming such an injury existed here), plaintiffs must show that their injury has been caused by the alleged antitrust violation and flows from the anticompetitive effects of the unlawful conduct. Plaintiffs, however, do not allege any harm that would constitute an antitrust injury. Plaintiffs do not assert that they have been—or could be, by the NCAA's Certification Bylaws—excluded from competing for college scholarships. There is no harm to competition in any relevant market which has caused plaintiffs any injury.

For all of these reasons, plaintiffs' allegations do not amount to any actual injury to identifiable, non-speculative "business or property". Therefore, plaintiffs have no standing to assert claims under the Sherman Act claim.

### 3.    Plaintiffs Do Not Allege Any "Antitrust Injury."

Even if plaintiffs had been injured in their business or property, they failed to demonstrate that it flowed from anti-competitive effects in the relevant market. As demonstrated in more detail below, plaintiffs fail to identify any relevant market, or any anti-competitive effect on a market that can be attributed to 30.16(l). As such, there is little to point to other than the total absence of any identification of an injury flowing from the anticompetitive effects of the NCAA's recruiting bylaws. That failure mandates dismissal for lack of an antitrust injury. See, Precision Surgical, 111 F. Supp. 2d at 590-91.

### C.    Plaintiffs' Failure to Plead the Essential Elements of a Claim Under Sherman Act §1 Warrants Dismissal and Precludes Injunctive Relief.

In addition to the absence of any facts establishing a right of these high school students to sue the NCAA under the antitrust laws, plaintiffs also fail to plead any fact supporting, or even the elements of, a Sherman Act claim.  The elements of a claim under Section One of the Sherman Act are:

> (1) that the defendants contracted, combined or conspired among each other;
> (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets;
> (3) that the objects of and conduct pursuant to the contract or conspiracy were illegal; and
> (4) that the plaintiffs were injured as a proximate result of that conspiracy.

In re Baby Foods Antitrust Litig., 166 F.3d 112, 118 (3rd Cir. 1999).  Moreover, just any "restraint" is insufficient -- Section 1 prohibits only *unreasonable* restraints of trade.  See Board of Regents, 468 U.S. at 98; Northwest Wholesale Stationers v. Pacific Stationery & Printing Co., 472 U.S. 284, 289 (1985) ("[E]very commercial agreement restrains trade.  Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an unreasonable restraint.").  Thus, in order to show a violation of Section One, Plaintiffs must show a conspiracy that restrains trade "unreasonably."  Plaintiffs' claims must be dismissed because they do not plead any of these elements.

Furthermore, to avoid dismissal, "the essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms."  Kingray, Inc. v. NBA, Inc., 188 F. Supp. 2d 1177 (S. D. Cal. 2002)(citing Double D. Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998)).  Plaintiffs' entire Complaint is contain little more than vague and conclusory terms.

### 1.    Plaintiffs Do Not Identify a Conspiracy

As an initial matter, plaintiffs only cryptically allege that "[v]arious individuals and entities, including NCAA member institutions, have participated as co-conspirators with the NCAA and performed in (sic) acts and made statements in furtherance of the conspiracy alleged herein." Complaint, ¶8. This is not sufficient to identify a conspiracy to restrain trade in violation of the Sherman Act. Plaintiffs do not identify a conspiracy at all, but only recite the word. Moreover, plaintiffs cannot rely on the "walking conspiracy" idea (i.e. everything the NCAA does is an antitrust conspiracy). Courts have routinely rejected such allegations, which reduce to the notion that organizations like the NCAA are "walking conspiracies." See e.g., Consol. Metal Prods., Inc. v. American Petroleum Inst., 846 F.2d 284, 293-94 (5th Cir. 1988) ("a trade association is not by its nature a 'walking conspiracy, its every denial of some benefit amounting to an unreasonable restraint of trade.'"); see also, Greater Rockford Energy & Tech. v. Shell Oil, 998 F.2d 391, 397 (7th Cir. 1993), cert. denied, 510 U.S. 1111, 114 S. Ct. 1054 (1994) (same); In re Circuit Breaker Litigation, 984 F. Supp. 1267, 1281 (C. D. Cal. 1997); Poindexter v. American Bd. of Surgery, Inc., 911 F. Supp. 1510, 1519 (N. D. Ga. 1994)(even when defendant is an association, "[p]roof of a conspiracy requires a showing that the conspirators had a rational economic motive for entering into the conspiracy, as well as a conscious commitment to cooperate in a scheme designed to achieve an unlawful objective.") Therefore, plaintiffs have failed to adequately plead facts demonstrating a conspiracy for purposes of the Sherman Act.

### 2.    Plaintiffs Fail to Plead Facts Showing That the Recruiting Bylaws, or 30.16(l), Have A Substantial Anticompetitive Effect in Any Relevant Market.

Plaintiffs' vague Complaint fails again when one looks for the hallmarks of antitrust claims -- a relevant market and an identifiable anticompetitive effect therein. Where a plaintiff

fails to plead facts establishing how NCAA rules restrain trade in a relevant market, dismissal under 12(b)(6) is appropriate. Banks, 977 F.2d at 1089.

First, the Complaint does not even attempt to identify any relevant market. Failure to do so is fatal to the claim. See, Coast Cities Truck Sales v. Navistar Int'l Transp. Co., 912 F. Supp. 747 (D. N.J. 1995); Adidas America, Inc. v. NCAA, 64 F. Supp. 2d 1097, 1101 (D.Kan. 1999)(granting judgment on the pleadings for failure to define relevant market because "[w]ithout defined relevant markets, there is no way for a court to determine whether a defendant has restrained trade in violation of § 1. . ."). As the Third Circuit explained:

> Where [an antitrust] plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436-37 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998). Plaintiffs clearly fail to allege a relevant market – the words do not even appear in the Complaint let alone the required definition. The Complaint, for this reason alone, must be dismissed. However, still more fatal deficiencies remain.

The second is that plaintiffs do not allege any adverse effect on competition in a relevant market that is caused by the Certification Bylaws. The adverse impact on competition in the market cannot even be guessed at. Therefore, plaintiffs' Complaint may be dismissed for failure to state a claim. Smith, 139 F.3d at 187 (no adverse impact outweighing obvious procompetitive aspects of NCAA bylaw); Banks, 977 F.2d at 1094 (dismissal appropriate because "failure to allege an anti-competitive impact on a discernible market justified the district court's dismissal for failure to state a claim upon which relief can be granted.")

36

On their face, it is obvious that the NCAA's recruiting bylaws do not restrain trade at all, but only condition how and when Division I coaches may recruit prospective student athletes consistent with the principles of amateurism and the recruiting principle.[14] Plaintiffs' allegations boil down to a claim that they will be personally disadvantaged because of their unique factual circumstances when compared to those prospects who have created or found a non-scholastic team to play with in certified tournaments. While the claimed "disadvantage" is suspect in light of the myriad of options available, it is well-established that "[t]he antitrust laws were enacted for the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962); Northeast Women's Center, Inc. v. McMonagle, 670 F. Supp. 1300, 1304 (E. D. Pa. 1987) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977)). Therefore, plaintiffs have not and cannot plead any anticompetitive effect in any relevant market and, therefore, their claims must be dismissed.

### 3.    The Certification Bylaws Are Procompetitive and Reasonable as a Matter of Law

Where the allegations are insufficient to state a claim regarding NCAA bylaws which could survive a rule of reason analysis, dismissal is appropriate. Smith, 139 F.3d at 186-87. Even if such anticompetitive impact had been identified, since there are no facts pled regarding such a hypothetical anticompetitive effect, the claim should be dismissed under the rule of reason analysis. Smith, 139 F.3d at 186-87. Courts applying a rule of reason analysis have done so under the following rubric:

---

[14] The NCAA Constitution defines the Principle of Recruiting: "The recruiting process involves the balancing of interests of the prospective student-athlete, their educational institutions and the Association's member institutions. Recruiting regulations shall be designed to promote equity among member institutions in their recruiting of prospects and to shield them from undue pressures that may interfere with the scholastic or athletics interests of prospects or their educational institutions. NCAA constitution, Art. 2.11.

A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects. The plaintiff bears the initial burden of showing that the restraint produces "significant anticompetitive effects" within a "relevant market." If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. The plaintiff must then show that "any legitimate objective can be achieved in a substantially less restrictive manner."

Tanaka v. NCAA, 252 F.3d 1059, 1063 (9th Cir. 2001); see also, Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 81 (3d Cir. 1977), cert. denied, 436 U.S. 913 (1978). As the Third Circuit in Smith summarized, the rule of reason test "asks essentially whether the challenged rule promotes or hinders competition." 139 F.3d at 186. The purpose of the NCAA's recruiting rules are procompetitive and described in detail above – they are designed to preserve amateurism and prevent professionalization of collegiate sports and recruiting, they maintain the connection between academics and sports and they promote competitive equity between institutions through recruiting regulation.[15] The Complaint herein contains no factual allegations that would counterbalance those recognized procompetitive virtues, or those stated in the rationale for the bylaw itself. Therefore, the Complaint should be dismissed for failure to state a claim under the Sherman Act. See, Smith, 139 F.3d at 187.

---

[15] In addition, the requirements of 30.16(l) will promote competitive equity since the practice of inducing star players to converge in various locations around the country to play on "all-star" non-scholastic teams threatens competitive equity. Most lack the resources to obtain sponsorship money to form such all-star teams and, instead, form their teams from local high school rosters or local players. By only certifying events of teams made up of players who are close to home, the rule has the added benefit of fostering an equalized level of play between competing teams. Moreover, the number of individuals and teams that may compete would likely increase since the "star" players who are no longer flown across the country to create "all-star" teams would likely generate new teams of competitors for summer play. There are certainly some teams who do not have the resources or the contacts to be able to import any star players from another state. The ability to of those teams to compete against such all-star teams would be significantly hampered by the types of teams Plaintiffs wish to protect. As such, those players would oppose such a rule. Therefore, competitive equity, a fundamental area the NCAA bylaws seek to protect, is also served by these recruiting bylaws.

Even if the Court were to assume that plaintiffs could demonstrate the above elements, such a finding would only shift the burden to the NCAA to identify the Bylaws' "procompetitive justification[s]," California Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999), or "pro-competitive virtues." Law v. NCAA, 134 F.3d 1010, 1019 (10th Cir. 1998). Any incidental effects on competitors in the market—which is not even a concern under the antitrust laws—are certainly outweighed by the procompetitive justifications for and effects of the certification rules. It is apparent that the NCAA's Certification Bylaws serve to promote, rather than suppress, competition. The Certification Bylaws at issue are part of a larger body of NCAA recruiting and eligibility standards and regulations that serve to protect the "amateur" and "academic" status of intercollegiate athletic competition, which is the very "product" the NCAA and its member institutions are in the "business" of marketing. Board of Regents, 468 U.S. at 101-102. As such, these rules are of the type that are necessary if the product is going to be available at all, and are therefore procompetitive. Even organizations like the Illinois High School Association believed stricter protective guidelines were necessary. Ex. Q.

It is for these reasons that "NCAA regulations designed to preserve amateurism and fair competition have previously been upheld as reasonable restraints under the rule of reason." Justice 577 F. Supp. at 382 (citing Hennessy, 564 F.2d at 1153-54; Jones, 392 F. Supp at 304, College Athletic Placement, *supra*). In Justice, the plaintiffs were barred from playing in post-season football games. In analyzing the eligibility rules under the rule of reason, the court found they were procompetitive and reasonable:

> The sanctions at issue in this case, like the regulations upheld under the rule of reason in Hennessey and Jones, have been shown to lack an anticompetitive purpose and to be directly related to the NCAA objectives of preserving amateurism and promoting fair competition. . . The fact that the sanctions might have an incidental

> anticompetitive effect on coaches or athletes does not in itself
> render them unreasonable restraints under the rule of reason.

Id. at 382.[16]  The very same reasoning applies in the instant case.

According to the Supreme Court, the activity of collegiate sports is "an industry in which horizontal restraints on competition are essential if the product is to be available at all." Board of Regents, 468 U.S. at 101.  In other words, amateur college basketball cannot exist without an agreement by all the member institutions involved as to a myriad of rules such as when the season will begin and end, how many games each team can play during the season, and parameters for actual play.  Similarly, in order for the NCAA to ensure that collegiate play maintains its amateur character, there must be rules that set parameters for recruiting, academic standards, and benefits that students may or may not receive during the recruiting process and during the time they spend at a member institution as a student-athlete.  If such rules did not exist, there would be utter chaos.  Imagine if there were no regulations to check the recruiting activities of Division I coaches!  Although many might still behave reasonably, some would likely not, especially in "big money" sports such as football and basketball.  Such a framework almost certainly would result in the most talented players being paid to play by specific coaches, with ever-increasing remuneration, bidding wars, street agents—in short, a professionalization of collegiate athletics.[17]  It is certainly, then, within the power of the NCAA to prescribe the regulations with which Division I coaches must comply during the recruiting process.

---

[16] While Plaintiffs attempt to rely on the NCAA v. Board of Regents case and the Law v. NCAA case, neither apply in this context.  The Justice case made manifest the distinction drawn in those cases – rules rooted in the NCAA's concern for the protection of amateurism are distinct from those with a "discernible economic purpose." Justice, 577 F. Supp. at 383.

[17] The Seventh Circuit, in Banks, noted these dangers of professionalization to college sports in holding that the eligibility rules at issue there, the NCAA's no-draft eligibility rules, did not unreasonably restrain trade under the antitrust laws.  977 F.2d at 1090-91.  The Court there stated:

Accordingly, the NCAA has enacted rules governing each intercollegiate sport that address both concerns common to all college athletics and concerns that might be particular to individual sports, or even to individual aspects of specific sports, which are meant to and have the effect of preserving amateurism in intercollegiate athletics and athletes. The Supreme Court has recognized that although such rules literally "restrain the manner in which institutions compete," they are also "regulations that enhance competition among member institutions," and are therefore reasonable as a matter of law. Board of Regents, 468 U.S. at 101, 103. Therefore, "[i]t is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive." Id. at 117.

As noted supra, the NCAA has a strong interest in protecting the integrity, competitive equity, and amateurism that are at the very core of intercollegiate athletic competition. As the Supreme Court recognized in Board of Regents, the special nature of the NCAA requires that consideration be given to the fact that what the NCAA offers as a "product" for consumption is intercollegiate amateur competition itself—as such, there are certain issues that must be agreed

---

> Elimination of the…rules would fly in the face of the NCAA's amateurism requirements. Member schools might very well be exposed to agents offering the services of their football playing clients to the highest bidder. In representing their 'pro-athlete' clients, the agents would in all probability attempt to bargain with the NCAA school and might very well expect the school to offer their client an attractive contract possibly involving automobiles, condominiums, and cash as compensation in contravention of the NCAA amateurism rules.…We should not permit the entry of professional athletes and their agents into NCAA sports because the cold commercial nature of professional sports would not only destroy the amateur status of college athletics but more importantly would interfere with the athletes proper focus on their educational pursuits and direct their attention to the quick buck in pro-sports.

Id. Similarly, the NCAA should be permitted to assure itself, through the Certification Bylaws, of the circumstances under which its Division I Basketball coaches are out evaluating prospective student-athletes. Like the eligibility requirements, recruiting restrictions are meant to keep professionalizing forces outside of the arena of college sports.

upon, and certain values that must be protected, in order to ensure the product's very existence. See e.g., Board of Regents, 468 U.S. at 101; NCAA v.Tarkanian, 488 U.S. 179, 198 n.18 (1988) (describing NCAA function of "fostering amateur athletics at the college level" as "critical"); see also, Bowers v. NCAA, 9 F. Supp. 2d 460, 497 (D. N.J. 1998); Gaines v. NCAA, 746 F. Supp. 738, 744-46 (M. D. Tenn. 1990); Jones v. NCAA, 392 F. Supp. 295, 303 (D. Mass. 1975). These restraints, particularly those that create and protect amateurism, are absolutely necessary to preserve college sports and maintain the distinction between college sports and professional sports. The NCAA's recruiting regulations, including the Certification Bylaws at issue here, are part and parcel of the "joint venture" that is amateur athletics, and without them it would be impossible to maintain the "product" of college sports as distinct from other sports and entertainment "products."

Plaintiffs offer nothing to weigh against the procompetitive justifications demonstrated by the NCAA and its committees that researched and designed these rules. Plaintiffs have not pled facts which establish a claim which could survive under the Rule of Reason. Thus, plaintiffs' Complaint is without merit and must be dismissed.

## III.    THE NCAA IS ENTITLED TO SUMMARY JUDGMENT

Summary judgment is appropriate in antitrust cases where a plaintiff is unable to produce "significant probative evidence" to support the bare allegations in its complaint. See First Nat'l Bank of Az. v. Cities Svc. Co., 391 U.S. 253, 290, 88 S. Ct. 1575 (1968). Likewise, an inability to produce sufficient evidence of a plausible conspiracy to restrain trade, or a failure to show an injury resulting from the illegal conduct, summary judgment must be granted. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 1355, (1986). Because there is

no issue of material fact regarding essential elements of plaintiffs' claim, the NCAA is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 on the grounds detailed below.

### A.    There is No Genuine Issue of Material Fact Remaining Regarding Whether Plaintiffs Will Be Subject to 30.16(l).

Plaintiffs seek only injunctive relief under the Sherman Act to prevent the application of 30.16(l) to them. There is no material issue remaining as to whether the rule will apply to them. First, the Court may take judicial notice that the summer of 2002 is over. Second, plaintiffs were each granted waivers of 30.16(l) upon application.[18] Exs. A-E; Decl. of J. Gentry, ¶¶7-8. Since the summer of 2002 is pled as the last summer during which these plaintiffs will play in certified events (Complaint ¶¶ 42 & 58), there is no remaining issue as to whether plaintiffs will be affected by 30.16(l). Therefore, the NCAA is entitled to summary judgment.

### B.    Plaintiffs Cannot Demonstrate a Genuine Issue Regarding Their Opportunity to be Observed by Division I Coaches.

Plaintiffs' claim relies upon the claim that 30.16(l) will prevent them from ever being seen by Division I coaches for recruiting purposes. Plaintiffs cannot generate a material issue of fact to support this essential element of both injury and causation.

First, plaintiffs cannot show that they would obtain a scholarship if seen by a Division I coach while that coach was conducting recruiting reviews. Nor are there facts to show that being seen at a non-scholastic team tournament would change the tide as opposed to a certified camp for individuals which promises "unmatched" or the "maximum" exposure. Exs. E-K.

---

[18] Players like Plaintiffs can seek a waiver of the rule through an NCAA member institution, conference or committee submitting an application. Ex. 1, Art. 5.4.1.4; Ex. 12; Decl. of J. Gentry ¶10. The review committee reviews cases on their individual facts and consider the purpose and intent of the involved NCAA legislation, possible recruiting or competitive advantages, the welfare of the involved student-athletes, written opinions from NCAA committees with expertise in the involved area and applicable administrative review case precedent. Any affected by 30.16(l) have this opportunity available.

Second, plaintiffs cannot show that they would not have the opportunity to be seen during the school year when Division I coaches have 70 recruiting days. Ex. 1 (Art. 13); Ex. 2. Likewise, they cannot establish that they could not be seen during Contact Periods or Quiet Periods described in the NCAA's recruiting rules. Ex. 1 (Art. 13); Ex. 2. In addition, those recruiting rules allow plaintiffs to be seen and evaluated through videos and other sources. Ex. 1 (13.4). Plaintiffs cannot dispute these facts.

Plaintiffs also cannot demonstrate a disputed issue of fact regarding their opportunities to be seen by Division I coaches conducting recruiting activities in settings other than certified team events. See Ex. E-K; see also, *supra*, Factual Background, sec. B. It is undisputed that 30.16(l), by its terms, only applies to team events. Ex. 11; Decl. of J. Gentry, ¶6. Finally, there can be no dispute that there are numerous certified events which do not require a team to attend. Ex. 5; Exs. E-K. And, as described in more detail above, numerous other opportunities for exposure and recruiting are available to prospective student athletes such as plaintiffs. Exs. E-P; Ex. 5.

Furthermore, plaintiffs can even choose to visit the Division I schools that they are interested in during the quiet periods which began just after the evaluation period in July. Ex. 2. Each can play with their chosen team at any tournament this summer other than the Division I certified tournaments and still obtain recruiting coverage which can be observed by Division I coaches. See, Exs. M & N. A plethora of other certified events and camps are available to plaintiffs as individuals, along with hundreds of non-certified camps that still host Division II and III coaches as well as the "top" recruiting scouts and scouting services who send scouting information to colleges and report on prospects' performance. Exs. E-O. There is no material issue of fact regarding whether plaintiffs must play in a certified tournament with a particular team -- it is beyond dispute that they do not. Therefore, plaintiffs' alleged injury based on

30.16(l) and the allegation that they will be unable to be observed by Division I coaches may be dismissed on summary judgment.

Plaintiffs claims rely on the implied fact that they would have no opportunity to be observed by Division I coaches for recruitment if they were prevented from playing in certified tournaments by 30.16(l). The above facts demonstrate that claim is false. Since there is no material fact regarding whether plaintiffs have such opportunities notwithstanding bylaw 30.16(l), the NCAA is entitled to summary judgment pursuant to Fed. R. Civ. P. 56.

### C.   Plaintiffs Cannot Demonstrate an Issue of Fact Regarding any Anticompetitive Effect on Any Relevant Market Due to 30.16(l).

Plaintiffs failure to plead a relevant market indicates that plaintiffs are also unable to demonstrate any facts establishing a relevant market. While such a glaring omission violates Rule 11, it also mandates summary judgment. As with any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably determine the relevant market. See Doctor's Hospital of Jefferson v. Southeast Medical Alliance, Inc., 123 F.3d 301, 306 (5th Cir. 1997); Bell v. Dow Chemical Co., 847 F.2d 1179, 1184 (5th Cir. 1988); Bathke v. Casey's General Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995) (quoting Flegel v. Christian Hosp., 4 F.3d 682, 689 (8th Cir. 1993)). The NCAA is entitled to summary judgment because there is no issue of fact from which a jury could reasonably determine the relevant market upon which plaintiffs' claims are based.

Likewise, an inability to demonstrate (or indeed plead) any anticompetitive effect on a relevant market simultaneously demonstrates a lack of any Rule 11 investigation as well as mandates summary judgment. See e.g., O'Dell v. General Motors Corp., 122 F. Supp. 2d 721 (E. D. Tex. 2000); A-Abart Electric Supply Inc. v. Emerson Elec. Co., 956 F.2d 1399,1406 (7th Cir. 1992), cert. denied, 506 U.S. 867 (1992). Plaintiffs do not even identify any anticompetitive

effect and have certainly done no Rule 11 investigation establishing such an effect. Therefore, the NCAA is entitled to summary judgment since plaintiffs cannot raise a genuine issue of fact regarding any anticompetitive effect on any relevant market attributable to 30.16(l).

**D.    The NCAA is Entitled to Summary Judgment Because The Recruiting Bylaws are Procompetitive Under the Rule of Reason.**

The NCAA has discussed the procompetitive nature of its recruiting rules, as recognized by many courts, in Sections II.A and II.C.3. It incorporates those discussions herein. However, significant additional evidence further establishes the procompetitive nature of 30.16(l) and the recruiting bylaws.

The NCAA's reports, as well as the statements by and interviews with student athletes, showed that amateurism and the connection between academics and athletics were at risk. Exs. 7 & 8. Various high school federations and organizations wrote that they too believed that stronger regulation regarding summer recruiting was necessary. Likewise, the Student Athletes Advisory Board suggested that strengthened certification rules were needed to prevent the professionalizing forces and damage to academics caused by summer recruiting. Ex. 8. Moreover, the image of collegiate sports was becoming tainted by the activities that had become associated with recruiting by Division I coaches during the summer. Ex. 8, 14, p. 14. The lack of oversight of coaches as well as the phenomenon of star players imported from around the country to make all-star teams who played grueling schedules were among the problems the strengthened certification rules, including 30.16 (l), were written to address. Ex. 7 & 10. The recruiting bylaws, including 13.13.3 which limits recruiting to camps certified pursuant to 30.16, are necessary for the NCAA member institutions to prevent a steady decline and further corruption of prospects who wish to become student-athletes.

Since the recruiting bylaws at issue in the instant case are clearly procompetitive, they survive rule of reason scrutiny. Therefore, the NCAA is entitled to judgment as a matter of law on plaintiffs' claim under the Sherman Act.

## CONCLUSION

Plaintiffs' claims must be dismissed because (1) NCAA Recruiting Bylaw 30.16 is not a commercial regulation subject to the Sherman Act and (2) Plaintiffs, as amateur prospective athletes, do not have antitrust standing because they do not have a property interest in competing for the attention of Division I coaches in the hopes of obtaining a Division I scholarship, and (3) plaintiffs fail to plead facts sufficient to state a claim under the Sherman Act § 1. The NCAA is also entitled to summary judgment (1) plaintiffs were granted waivers; (2) plaintiffs have the opportunity to attend certified tournaments outside of the application of 30.16(l); (3) Plaintiffs cannot establish a relevant market on anticompetitive effects, and (4) the recruiting bylaws

survive the rule of reason analysis as a matter of law.  For these reasons the NCAA is entitled to dismissal with prejudice or, in the alternative, summary judgment.

DATED:  August 26, 2002

                                        Respectfully submitted,

                                        DRINKER BIDDLE & REATH LLP

                                        By: _____

                                        David P. Bruton
                                        Paul H. Saint-Antoine
                                        One Logan Square
                                        18th and Cherry Streets
                                        Philadelphia, PA  19103-6996
                                        (215) 988-2700

                                        and

                                        Gregory L. Curtner
                                        Frederick R. Juckniess
                                        MILLER, CANFIELD, PADDOCK AND STONE,
                                        P.L.C.
                                        101 North Main
                                        Seventh Floor
                                        Ann Arbor, MI  48104-1400
                                        (734) 663-2445

                                        Attorneys for Defendant National Collegiate
                                        Athletic Association

## CERTIFICATE OF SERVICE

I, David P. Bruton, certify that I served today a true and correct copy of the

foregoing National Collegiate Athletic Association's Motion to Dismiss and For Summary

Judgment and Memorandum and Exhibits in support thereof via hand delivery upon the

following:

<div style="margin-left: 3em;">

Richard M. Meltzer, Esquire
**PELINO & LENTZ, P.C.**
One Liberty Place
32nd Floor
1650 Market Street
Philadelphia, PA  19103


Ira P. Tiger, Esquire
**SCHNADER, HARRISON, SEGAL & LEWIS LLP**
1600 Market Street
Suite 3600
Philadelphia, PA  19103

</div>

David P. Bruton

Dated: August 26, 2002